**METROPCS, INC., Plaintiff,**

v.

**CITY AND COUNTY OF SAN FRANCISCO, et al., Defendants.**

**No. C–02–3442 PJH.**

United States District Court, N.D. California.

April 25, 2003.

---

Duffy Carolan, Davis Wright Tremaine LLP, San Francisco, CA, Martin L. Fineman, Treg Tremont,Davis Wright Tremaine LLP, San Francisco, CA, for Plaintiff.

Glenn A. Harris, William K. Sanders, City Attorney's Office, San Francisco, CA, for Defendants.

## ORDER

HAMILTON, District Judge.

The parties' cross-motions for summary judgment came on for hearing on April 16, 2003 before this court, the Honorable Phyllis J. Hamilton presiding.   Plaintiff

MetroPCS appeared through its counsel, Martin Fineman, and defendants City and County of San Francisco et al. ("the City") appeared through its counsel, William Sanders. Having read the papers and carefully considered the relevant legal authority, the court hereby rules as follows.

## BACKGROUND

MetroPCS provides wireless telecommunication services in the Bay Area. On January 15, 2002, MetroPCS applied to the City for a conditional use permit ("CUP") to build a base station at the Geary Boulevard Mall Parking Garage. Nahmanson Decl. Exh. 1. MetroPCS claims it needs this installation to better serve its customers in the Richmond district. *Id.*

The parking garage is located at 5200 Geary Boulevard, between 16th and 17th Avenue. MetroPCS proposed to mount six antennas on an existing light pole on the roof of the garage, with equipment cabinets built behind an existing wall. The antennas would be painted the color of the garage. Nahmanson Decl. Exh. 1; *see also* G642; MetroPCS Opening Br. Exh. A (photo simulations of the installation).

The San Francisco Planning Commission conditionally approved MetroPCS's application on April 18, 2002. G20–G32.[1] The San Francisco Board of Supervisors subsequently received protests filed by approximately 80 property owners representing 58.95% of the land area within 300 feet of the garage, a petition in opposition signed by hundreds of local residents, and an appeal of the Planning Commission's decision filed by a local resident, Robert Blum. G43–58; G–59–60, G61–G149; G209, G210–G484.

On June 17, 2002, the Board of Supervisors held a public hearing concerning MetroPCS's application.[2] At the hearing, a number of community members and supervisors indicated their disapproval of the application. *See, e.g.,* Tr. 176–77, 180–83. The Board of Supervisors then voted to deny MetroPCS the CUP. G688. Those findings were then adopted in a written denial on June 24, 2002. G694–G698.

MetroPCS claims the City violated section 332(c)(7) of the Telecommunications Act of 1996, 47 U.S.C. § 151 et seq., when it denied the CUP and moves for summary judgment on their first cause of action only. The City has also moved for summary judgment on the first cause of action, claiming it acted properly.

## DISCUSSION

### A. Legal Standard—Summary Judgment

Summary judgment is appropriate when the evidence shows there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court will resolve all disputed issues of fact in favor of the non-moving party. *Id.* at 255, 106 S.Ct. 2505.

### B. Written Decision

A local government's decision to deny a request to construct a wireless facility must be "in writing." 47 U.S.C. § 332(c)(7)(B)(iii). MetroPCS claims as a preliminary matter that the City's denial does not meet this requirement.

Courts are split on interpretations of the "in writing" requirement. *See, e.g., New*

---

1. The portions of the administrative record relevant to this motion were filed by the City as "Certified Copy of the Administrative Record (with Exhibit B)," and Bates labeled with a G prefix (for Geary).

2. The hearing transcript ("Tr.") is provided at Exhibit C of the City's Certified Copy of the Administrative Record.

*Par v. City of Saginaw,* 301 F.3d 390, 395 (6th Cir.2002) (explaining the range of requirements adopted); *Southwestern Bell Mobile Systems v. Todd,* 244 F.3d 51, 59 (1st Cir.2001) (same). Some courts have held that the governing local body must issue full findings of fact and conclusions of law, *see, e.g., Omnipoint Communications, Inc. v. Planning & Zoning Comm'n,* 83 F.Supp.2d 306, 309 (D.Conn.2000), while others state that merely stamping the word "DENIED" on an application is sufficient, *AT & T Wireless PCS v. City Council of Virginia Beach,* 155 F.3d 423, 429 (4th Cir.1998).

In *Todd,* the First Circuit reviewed these precedents, and noted that "[b]oth of these approaches seem flawed." 244 F.3d at 59. On the one hand, the statutory language does not require detailed findings of fact and conclusions of law, and the court acknowledged that local governing boards are staffed by laypersons and not attorneys. On the other hand, the board must give sufficient information in its written denial to permit judicial review, and the statute requires a denial separate from the hearing record. *Id.* at 59–60.

■ Accordingly, *Todd* adopted a standard that "requires local boards to issue a written denial separate from the written record." 244 F.3d at 60. Furthermore, "[t]hat written denial must contain a sufficient explanation of the reasons for the permit denial to allow a reviewing court to evaluate the evidence in the record supporting those reasons." *Id.* (but specifically permitting a court to review the record as well). *See also New Par,* 301 F.3d at 395 (Sixth Circuit adopting *Todd* standard). The *Todd* standard thus reconciles both the statutory language and Congressional intent of the "in writing" requirement, and the court adopts it here.

■ The City here has issued a written denial separate from the written record,

G692–700, which summarizes the proceedings, articulates the reasons it rejected MetroPCS's application, and provides sufficient information for judicial review in conjunction with the written record. This opinion meets the "in writing" requirement of 47 U.S.C. § 332(c)(7)(B)(iii), and summary judgment in favor of the City is granted on this issue.

## C. Substantial Evidence

A local government's decision to deny a request to construct a wireless facility must also be based upon "substantial evidence." 47 U.S.C. § 332(c)(7)(B)(iii). This standard under the Telecommunications Act is intended as "the traditional standard used for judicial review of agency actions." H.R. Conf. Rep. 104–458 at 208, *reprinted in* 1996 U.S.C.A.A.N. 124 at 223 (Conference Committee for the Telecommunications Act); *see also. e.g., Preferred Sites, LLC v. Troup County,* 296 F.3d 1210, 1218 (11th Cir.2002) (citing Congressional intent and listing cases across several circuits adopting traditional "substantial evidence" standard for review of Telecommunications Act cases arising under § 332(c)(7)(B)(iii)). MetroPCS claims that the City's decision does not meet this standard.

■ Preliminarily, the parties dispute whether MetroPCS bears the burden of proof in demonstrating that the City's decision is not supported by substantial evidence, or whether the City bears the burden of demonstrating that its decision is supported by substantial evidence. The case law is split on this issue. *See, e.g., El Cajon,* 83 F.Supp.2d at 1164–65 (noting split and stating that Ninth Circuit has not yet reached the issue); *Cellular Telephone Co. v. Town of Oyster Bay,* 166 F.3d 490, 496–97 (2d Cir.1999) (noting split and expressly declining to resolve the issue since prevailing party would prevail either way). Because this decision should be evaluated

like any other administrative decision, the court agrees with the First Circuit in placing the burden of proof on MetroPCS. *See, e.g., Second Generation Properties. L.P. v. Town of Pelham,* 313 F.3d 620, 627 (1st Cir.2002) ("The substantial evidence test is highly deferential to the local board"), *citing Todd,* 244 F.3d at 58 ("The substantial evidence standard of review is the same as that traditionally applicable to a review of an administrative agency's findings of fact.").

■■■ The City's decision will be considered supported by substantial evidence if the record contains "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Preferred Sites,* 296 F.3d at 1218 (citation omitted); *Telespectrum v. Public Service Commission of Kentucky,* 227 F.3d 414, 423 (6th Cir.2000); *Airtouch Cellular v. City of El Cajon,* 83 F.Supp.2d 1158, 1164 (S.D.Cal.2000). This requires "more than a scintilla of evidence but less than a preponderance." *El Cajon,* 83 F.Supp.2d at 1164 (citation omitted); *see also. e.g., Preferred Sites,* 296 F.3d at 1218 (citation omitted). In conducting such a review, the court must examine the entire record, including evidence unfavorable to the City. *See, e.g., El Cajon,* 83 F.Supp.2d at 1164 (citations omitted). The court may only review the material that was before the City at the time of decision.[3] *Id.* If any one ground provided by the City is supported by substantial evidence, the denial is proper. *See Oyster Bay,* 166 F.3d at 495.

■■■ Finally, when evaluating this decision, "local and state zoning laws govern the weight to be given the evidence."

*Oyster Bay,* 166 F.3d at 494 (because Telecommunications Act not intended to preempt state and local zoning regulations). The City's interpretation of its own zoning laws "is entitled to great weight and should be respected by the court unless it is clearly erroneous or unauthorized." *Carson Harbor Village Ltd. v. City of Carson,* 70 Cal.App.4th 281, 290, 82 Cal.Rptr.2d 569 (1999).

One of the grounds for the City's denial was the finding that "there is no necessity for the proposed six panel antennas to be approved and installed for residential or business purposes in the neighborhood." G696. MetroPCS argues that there is insufficient evidence to support a finding that the Richmond district did not need another wireless telecommunications service provider.

The City is permitted to consider the adequacy of the services already present in an area, and thus the necessity of the proposed services in question, when determining whether to grant a CUP for additional services. San Francisco Planning Code § 303(c)(1) (City may consider whether proposed development "is necessary or desirable for, and compatible with, the neighborhood or community").[4] Thus, the only question is whether the record demonstrates substantial evidence in support of the City's determination.

■■■ A significant number of community members that opposed the installation indicated that they had adequate wireless services in their district. *See, e.g.,* G43, G210, G214, G235, G236, G255;[5] *see also* Tr. 104:4–7; 128:12–17; 137:7–15; 146:18–20. Statements of community members

---

3. For this reason, the Court will not consider the declaration of Suki McCoy, or any other extrinsic evidence, in determining the sufficiency of the Board's decision.

4. Copies of the San Francisco Planning Code are found at the City's Request for Judicial Notice ("City RJN") Exh. A.

5. The remainder of the letters raising this issue were identical to these. *See* G44–G58, G493, G494, G497–G511, G514–535 (identical to G43); G224 (identical to G214); G241, G242, G246, G247, G251, G253, G260, G261 (identical to G235); G237, G243, G248, G248, G250, G252 (identical to G236).

speaking from their own experience is considered substantial evidence in evaluating the record. *See, e.g., El Cajon,* 83 F.Supp.2d at 1165 (city may rely on statements when "they are based on personal experience and not mere speculation"). Thus, there is substantial evidence supporting the City's determination that, on balance, the Richmond district did not need the MetroPCS antenna.[6] Summary judgment in favor of the City is granted on this issue.

## D. Discrimination

MetroPCS next argues that by claiming lack of necessity for its antenna installation, the City has essentially taken the position that the existing wireless services providers already established in the Richmond district are sufficient and thus will not permit a competitor to enter that market, citing Supervisor Yee's comments that "residents ... say there is not a need ....Does that mean that every single new company that wants to open up shop in San Francisco ... that we should let them?" Tr. 180:10–25. MetroPCS argues that this improperly discriminates among

providers of wireless services, in violation of 47 U.S.C. § 332(c)(7)(B)(i)(I).

Title 47 U.S.C. § 332(c)(7)(B)(i) states that "[t]he regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof—(I) shall not unreasonably discriminate among providers of functionally equivalent services." In determining whether a CUP should be granted to a telecommunications services provider, "some discrimination among providers of functionally equivalent services is allowed. Any discrimination need only be reasonable." *Sprint Spectrum v. Willoth,* 176 F.3d 630, 638 (2d Cir.1999), *quoting Virginia Beach,* 155 F.3d at 427. Cities retain "the flexibility to treat facilities that create different visual, aesthetic, or safety concerns differently to the extent permitted under generally applicable zoning requirements, even if those facilities provide functionally equivalent services." H.R. Conf. No. 104–458 at 208, *reprinted in* 1996 U.S.C.A.A.N. at 222 (legislative history of Telecommunications Act).

---

**6.** For this reason, the court need not reach the question of whether there is substantial evidence supporting the Board's determination that MetroPCS's installation would cause visual blight, or that MetroPCS did not need the antennas for its own service. The court notes, however, that much of the evidence concerning visual blight consisted solely of non-admissible generalized aesthetic concerns. *Todd,* 244 F.3d at 61 (generalized complaints applicable to any installation and that do not note the installer's attempts to mask the structure may be disregarded); *see, e.g.,* G214, G236 (describing antennas generally as "an eyesore," without noting that antennas would be camouflaged). The specific concerns raised appeared mistakenly to be based on the belief that MetroPCS would be installing a 50 foot antenna on top of the 40 foot garage. Tr. at 112:1–5; *see also* 113:13–16 ("The 50–foot–tall antennas on top of a 40–foot high building are an undesirable eyesore, and it is totally out of ... character with the

neighborhood."); *see also* G226, G233. Concerns that misunderstand the visual impact of the installation may not be relied upon as substantial evidence. *Oyster Bay,* 166 F.3d at 495; *New Par,* 301 F.3d at 398.

On the question of MetroPCS's need for the antenna, the court notes that while MetroPCS may not have adequately explained its methodology when explaining its service coverage analysis to the board, neither did the Blums. MetroPCS also credibly explained why the 5200 Geary location was, while not ideal, workable with the antennas installed on the light pole, despite its initial belief that the location was too low to be technologically feasible. Tr. 163:18–10; 169:6–9 (MetroPCS was willing to accept 5200 Geary as a compromise between its technological needs and those of the community). Without a further showing, the record does not appear to support the board's decision that MetroPCS did not need the installation.

**1012**

■ In order to prevail on this claim, MetroPCS must show that the City "discriminated among providers of functionally equivalent services and that these providers were treated unequally." *Omnipoint Comm., Inc. v. City of White Plains,* 175 F.Supp.2d 697, 717 (S.D.N.Y.2001) (citation omitted). In other words, MetroPCS must demonstrate that the City treated a MetroPCS competitor differently than it treated MetroPCS for a functionally identical request. *Sprint Spectrum L.P. v. Board of Zoning Appeals of the Town of Brookhaven,* 244 F.Supp.2d 108, 117 (E.D.N.Y.2003).

■ The City is permitted under the Planning Code to take the community's need for the proposed services into account when making zoning decisions, and under the Telecommunications Act, a valid zoning decision may properly form the basis of a denial of a telecommunication company's request to provide services. *See, e.g., Willoth,* 176 F.3d at 639 ("discrimination based on traditional bases of zoning regulation ... is not unreasonable") (citation omitted); *Virginia Beach,* 155 F.3d at 427; *AT & T Wireless PCS, Inc. v. Town of Porter,* 203 F.Supp.2d 985, 1000 (N.D.Ind.2002). Because the city made a

valid zoning decision when it denied MetroPCS's claim, MetroPCS's claim of unreasonable discrimination fails.[7]

Furthermore, to prevail on this claim, MetroPCS must show that other providers have been permitted to build similar structures on similar sites while it has been denied. *See, e.g., Brookhaven,* 244 F.Supp.2d at 117; *White Plains,* 175 F.Supp.2d at 718; *Bellsouth Mobility, Inc. v. Parish of Plaquemines,* 40 F.Supp.2d 372, 381 (E.D.La.1999). The other telecommunications services providers that have been permitted to build antennas in the Richmond district are differently situated from MetroPCS because they have sought to place their antenna structures at different locations within the district. *See* Tr. 174:12–22 (Supervisor McGoldrick explaining that another antenna had been approved in the Richmond district because it was located at a Preference 1, or more ideal, site). This does not constitute unreasonable discrimination under the Telecommunications Act, as a matter of law.[8] Summary judgment in favor of the City is granted on this issue.

**E. Prohibiting Provision of Personal Wireless Services**

MetroPCS next claims that the City's decision has the effect of prohibiting the

7. To the extent that MetroPCS claims that the City had discriminatory intent against MetroPCS based on Supervisor Yee's comments, that is not a proper basis for a claim under section 332(c)(7)(B)(i)(I). *Sprint Spectrum L.P. v. Town of Easton,* 982 F.Supp. 47, 51 n. 2 (D.Mass.1997) (intent alone insufficient to prevail on 332(c)(7)(B)(i)(I) claim). In any event, the City correctly points out that, when the comments are read in their entirety, it is clear that Supervisor Yee was addressing the community's need for the proposed services as a traditional zoning concern and not expressing any particular animus towards MetroPCS. Tr. 180:10–181:9. *See also* Tr. 183:1–21 (Supervisor Peskin stating that the Board's decision was "not a judgment on whether we want MetroPCS or not, but in this

particular instance, I do not believe that those findings [of necessity under the zoning laws] have been adequately met").

8. The two cases cited by MetroPCS finding discrimination are distinguishable. In *Western PCS II Corp. v. Extraterritorial Zoning Authority of the City and County of Santa Fe,* 957 F.Supp. 1230, 1237–38 (D.N.M.1997) and in *Easton,* 982 F.Supp. at 51, unreasonable discrimination was found based on the defendants' improper consideration of unsubstantiated evidence and misapplication of the relevant zoning laws. Here, the City based its decision on proper zoning concerns and substantiated evidence of the Richmond district's lack of necessity for these particular MetroPCS services.

provision of wireless services, in violation of 47 U.S.C. § 332(c)(7)(B)(i)(II). Section 332(c)(7)(B)(I) states that: "[t]he regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof—(II) shall not prohibit or have the effect of prohibiting the provision of personal wireless services."

MetroPCS, as the party challenging the locality's ruling, bears a "heavy" burden of proof on this issue. *See Town of Amherst, New Hampshire v. Omnipoint Communications Enterprises, Inc.,* 173 F.3d 9, 14 (1st Cir.1999) (carrier must show "not just that this application has been rejected but that further reasonable efforts are so likely to be fruitless that it is a waste of time even to try."); *360 Communications Co. of Charlottesville v. Board of Supervisors of Albemarle Cty.,* 211 F.3d 79, 88 (4th Cir. 2000).

### 1. General Ban

■■■ MetroPCS claims that the City has imposed a general ban on any new entrants into the San Francisco wireless communications market. The City has demonstrated that MetroPCS has been permitted to install 30 antennas within San Francisco, and has been granted 18 CUPs as well. Ionin Decl. ¶¶ 4–5; Exh. A. MetroPCS in fact has already entered, and offers service, in the Bay Area market. McCoy Decl. Exh. C. MetroPCS thus cannot show that it has been denied entry into the San Francisco telecommunications market. Summary judgment in favor of the City on this issue is warranted.

### 2. Service Gap

■■■ MetroPCS claims next that while it offers some service in the Bay Area, the City's refusal to permit it to install the antenna at the 5200 Geary site creates a gap in its service that is sufficiently wide to constitute a denial of service. To pre-

vail on a claim under § 332(c)(7)(B)(i)(II) based on a service gap, MetroPCS must show first that "its facility will fill an existing significant gap in the ability of remote users to access the national telephone network," and next, that "the manner in which it proposes to fill the significant gap in service is the least intrusive on the values that the denial sought to serve." *APT Pittsburgh Ltd. Partnership v. Penn Township Butler County of Pennsylvania,* 196 F.3d 469, 480 (3rd Cir.1999); *see also Cellular Telephone Co. v. Zoning Board of Adjustment of the Borough of Ho–Ho–Kus,* 197 F.3d 64, 69 (3rd Cir.1999).

#### a. "Significant Gap"

There is a circuit split as to what constitutes a "significant gap" in services. The Third Circuit has held that a "significant gap" is a gap in coverage that no provider has been able to fill—so if any provider has provided coverage for the area, no significant gap exists. *APT Pittsburgh,* 196 F.3d at 480. The First Circuit has held, on policy grounds, that a "significant gap" exists if any provider cannot provide general service in a certain area, even if other providers can. *Second Generation,* 313 F.3d at 634 (reviewing case law of other circuits, legislative history, and policies behind Telecommunications Act). In other words, *APT Pittsburgh* holds that a "significant gap" in services is a gap as perceived by all the users of a network, and *Second Generation* holds that a "significant gap" in services is a gap as perceived by a service provider, or an individual user subscribed to a specific service provider, in the network.

The court finds the First Circuit position more persuasive. *Second Generation* argues that the policy considerations behind the Telecommunications Act were to encourage competition in the wireless telecommunications marketplace, and that the Third Circuit's position does not adequately do so.

To use an example from this case, it is of little comfort to the customer who uses AT & T Wireless ... who cannot get service along the significant geographic gap which may exist along Route 128 that a Cingular Wireless customer does get some service in that gap. Of course, that AT & T Wireless customer could switch to Cingular Wireless. But were the rule [the Third Circuit rule] adopted, the same customer might well find that she has a significant gap in coverage a few towns over, where AT & T Wireless, her former provider, offers service but Cingular Wireless does not. The result would be a crazy patchwork quilt of intermittent coverage.. That quilt might have the effect of driving the industry towards a single carrier. When Congress enacted legislation to promote the construction of a national cellular network, such a consequence was not, we think, the intended result.... *The fact that some carrier provides some service to some consumers does not in itself mean that the town has not effectively prohibited services to other consumers.*

313 F.3d at 633–34 (citations omitted) (emphasis added).

Thus, the court finds that a "significant gap" is a gap in any individual service provider's coverage in a specific area. This gap, however, must be a significant gap and not merely individual "dead spots" within a greater service area.[9] Therefore, once a provider has some general coverage in an area, even if certain "dead zone" holes exist in certain specific locations, no "significant gap" exists. *Willoth,* 176 F.3d at 643–44.

Here, questions of fact exist as to whether MetroPCS has a "significant gap" in coverage for the Richmond district, or if MetroPCS merely has certain dead spots in its current coverage for that area. *Compare* McCoy Decl. (indicating general coverage in the Richmond district with MetroPCS service, and only certain dead spots); McCoy Decl. Exh. C (MetroPCS marketing materials claiming coverage throughout the Bay Area) *with* Nahmanson Decl. ¶ 19 (describing "significant gap" in Richmond coverage); Schwartz Decl. ¶ 7 (describing degrading of network based on "seemingly small coverage holes and weak spots"); Tr. 163:1–7 (MetroPCS claiming it "can't service this neighborhood" without 5200 Geary installation). Summary judgment on this issue for both parties is thus denied.

b. Other Options

In addition, even if MetroPCS prevails on the "significant gap" issue, MetroPCS must next demonstrate that its proposed installation at 5200 Geary is the only acceptable option to provide coverage for the Richmond district.

Again, there is a circuit split on this issue. The Second and Third Circuits require that the city accept "the least intrusive proposal" that allows coverage in the area. *APT Pittsburgh,* 196 F.3d at 480; *Willoth,* 176 F.3d at 643. The Fourth Circuit, though, has rejected that approach, noting that "[a] community could rationally reject the least intrusive proposal in favor of a more intrusive proposal that provides better service or that better promotes commercial goals of the community." *360 Comm.,* 211 F.3d at 87.[10] The

---

**9.** De minimus "dead spots," or specific, small locations in a service area without coverage, are permissible under the Telecommunications Act and are not considered to be a "significant gap." *360 Comm.,* 211 F.3d at 87; 47 C.F.R. §§ 22.911(b), 22.99.

**10.** Other courts have noted that "commentators have noted the national trend away from the Fourth Circuit on this issue." *USCOC of Virginia RSA#3, Inc. v. Montgomery County Board of Supervisors,* 245 F.Supp.2d 817, 827 (W.D.Va.2003).

court reconciles these authorities by adopting a fact-based test that requires the provider to demonstrate that its proposed solution is the most acceptable option for the community in question.

There are questions of fact concerning whether MetroPCS's antenna installation is in fact the most acceptable option. Community members have suggested that MetroPCS enter into licensing agreements to use the antennas of other providers who already have antennas installed in the Richmond district, Tr. 103:4–9, or install an antenna in an area specifically zoned for antenna installations, Tr. 95:12–16. MetroPCS has claimed these options are unacceptable, but does not explain why, or if it has attempted to do so and failed. Tr. 169:14–17. MetroPCS also does not address whether an alternate site in the Richmond could close its alleged service gap. Questions of fact thus exist on the issue of alternate options for MetroPCS, and summary judgment on this issue at this time for either party is not warranted.

F.  Environmental Issues

Finally, MetroPCS claims that the City based its denial on the purported adverse environmental effects of radio frequency omissions, in violation of 47 U.S.C. § 332(c)(7)(B)(iv). Section 332(c)(7)(B)(iv) states: "No State or local government or instrumentality thereof may regulate the placement, construction, and modification of personal wireless service facilities on the basis of the environmental effects of radio frequency emissions to the extent that such facilities comply with the Commission's regulations concerning such emissions." *See also Telespectrum,* 227 F.3d at 424; *Iowa Wireless Services, L.P. v. City of Moline,* 29 F.Supp.2d 915, 924 (C.D.Ill.1998) (emissions may not be the sole reason for the denial of a permit).

While many people did express concerns about radio frequencies at the hearing, *see, e.g.,* Tr. 109:14–110:3; 128:18–21; 130:13–20; 133:21–23, 141:9–12; 155:18–19; *see also* G46–G58; G210–G277; G493–G535; G690–G691 (almost all letters submitted in opposition mentioning concerns over radio frequency emissions), the party opposing the CUP, Blum, specifically stated that his opposition was not based on radio emission concerns. "First, I want to make it clear that we are not arguing adverse health effects here [from radio emissions]. I can't, you know, stop people from talking about their concerns. They have First Amendment rights. But that is not our argument. Our argument is the lack of necessity." Tr. 171:18–23. Similarly, the City makes no mention of environmental concerns motivating its decision in its written denial. G696–698. There is no evidence that environmental concerns formed any role, much less the only role, in the denial of MetroPCS's application. Summary judgment in the City's favor is warranted on this issue.

G.  Conclusion

Both parties' motions for summary judgment on the first cause of action are DENIED, but solely on the issue of whether the City's adverse decision against MetroPCS violates 47 U.S.C. § 332(c)(7)(B)(i)(II) on the question of whether a service gap exists in the San Francisco Richmond district. Summary judgment on the remainder of the issues raised in these motions, namely, MetroPCS's two § 332(c)(7)(B)(iii) claims (written decision and substantial evidence), MetroPCS's § 332(c)(7)(B)(i)(I) claim (discrimination) and § 332(c)(7)(B)(iv) claim (environmental effects), is GRANTED as to the City and DENIED as to MetroPCS.

This order fully adjudicates the matters listed at nos. 31, 35, and 43 on the clerk's docket for this case.

**IT IS SO ORDERED.**