**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SPRINT PCS ASSETS, L.L.C., a
Delaware limited liability
company, wholly-owned by SPRINT
TELEPHONY PCS, L.P., a Delaware
limited partnership,
                    *Plaintiff-Appellant,*

v.

CITY OF LA CAÑADA FLINTRIDGE, a
public entity; STEPHEN A. DEL
GUERCIO, in his official capacity as
Mayor of the City of La Cañada
Flintridge; LAURA OLHASSO, in her
official capacity as Mayor Pro
Tem of the City of La Cañada
Flintridge; ANTHONY J.
PORTANTINO, in his official
capacity as Council Member of
the City of La Cañada Flintridge;
GREGORY BROWN, in his official
capacity as Council Member of
the City of La Cañada Flintridge;
DAVID A. SPENCE, in his official
capacity as Council Member of
the City of La Cañada Flintridge,
                    *Defendants-Appellees.*

No. 05-55014

D.C. No.
CV-03-00039-DOC

OPINION

Appeal from the United States District Court
for the Central District of California
David O. Carter, District Judge, Presiding

Argued and Submitted
October 19, 2005—Pasadena, California

733

Filed January 17, 2006

Before: Cynthia Holcomb Hall, Diarmuid F. O'Scannlain,
and Richard A. Paez, Circuit Judges.

Opinion by Judge O'Scannlain

## COUNSEL

John J. Flynn, III, Nossaman, Guthner, Knox & Elliot, LLP, Irvine, California, argued the cause for the appellant. Gregory W. Sanders and Michael W. Shonafelt were on the briefs.

Scott J. Grossberg, Cihigoyenetche, Grossberg & Clouse, Rancho Cucamonga, California, argued the cause for the appellees. Richard R. Clouse, Amy von Kelsch-Berk, and Angelica Arias were on the brief.

## OPINION

O'SCANNLAIN, Circuit Judge:

This case requires us to determine whether a city can, consistent with California and federal law, deny a telecommunications company a permit to construct and to install a wireless antenna based on aesthetic considerations.

I

Sprint PCS is a wireless telecommunications company seeking to install two wireless telecommunications facilities in the city of La Cañada Flintridge ("the City"). The City denied Sprint's applications to install these wireless facilities, finding that they would obstruct the rights-of-way and would have a deleterious aesthetic impact on the neighborhood. The City rejected Sprint's applications pursuant to its local wireless ordinance, which authorized the City to deny permit applications, *inter alia*, on aesthetic grounds. After the City denied two of Sprint's five applications, Sprint brought two actions against the City—one for each permit application denied—alleging violations of the federal Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 (codified as amended in scattered sections of 15, 18, & 47 U.S.C.) ("Telecom Act"), and the California Public Utilities Code, Cal. Pub. Util. Code §§ 7901, 7901.1 ("Utilities Code"). The district court determined that there was not substantial evidence supporting the City's finding that Sprint's facilities would obstruct the rights-of-way. The district court, however, found that there was substantial evidence supporting the aes-

thetic rationale for denying the permit. Sprint appeals from the grant of summary judgment in favor of the City upholding the permit denials based on aesthetic impact, arguing the denials violate state law.

## II

In October 2001, the City enacted an ordinance setting forth four criteria that applicants for a Public Right-of-Way Above Ground Construction permit ("permit") must satisfy. According to Ordinance 324, "An Urgency Ordinance of the City Council of the City of La Cañada Flintridge Adopting a Moratorium on the Issuance of Any Demolition, Grading, Utility, Excavation or Other Permits Relating to Above-Ground Structures Along City Public Rights-of-Way" ("Ordinance 324"), those criteria are:

(1) The proposed above-ground structure does not obstruct access for pedestrians, nor block view [sic] of vehicles, pedestrians or bicyclists;

(2) The proposed above-ground structure is compatible with existing above-ground structures along the public right-of-way, and does not result in an over-concentration of above-ground structures along the public right-of-way;

(3) The proposed above-ground structure preserves the existing character of the surrounding neighborhood, and minimizes public views of the above-ground structure; and

(4) The proposed above-ground structure does not result in a negative aesthetic impact on the public right-of-way or the surrounding neighborhood.

Criteria (2), (3) and (4) are aesthetic, or non-functional.

Sprint applied for five permits shortly after the City enacted its Ordinance. The City granted two of the permit applications, Sprint withdrew one application, and the City rejected two of the applications which are the bases for Sprint's complaint.

Sprint intended to construct a wireless facility along Figueroa Street, and applied for a permit in December, 2001, and for a second wireless telecommunications facility along Descanso Drive in July, 2002. After a variety of appeals through the City Public Works and Traffic Commission, Sprint ended up in the City Council, which held hearings and denied Sprint's applications. As to the Figueroa Street application, the City Council based its denial on findings that: (1) the facility "will significantly damage the existing character of the neighborhood and result in a negative aesthetic impact on the right-of-way"; (2) "[t]he proposed Project will change the character of the neighborhood and will result in a negative aesthetic impact on the public right-of-way"; (3) "[t]he antennas will negatively impact the residence's views and the character of the neighborhood"; and (4) the antennas are "unsightly." The City also found that the proposed facility would obstruct access to the public right-of-way, but the district court found that this ground was not supported by substantial evidence—a finding that the City does not challenge.

As for the Descanso Drive telecommunications facility installation permit, the City Council found that the proposed facility did not satisfy criteria (2), (3), and (4) of the City Moratorium. Specifically, the City Council found that: (1) the facility did not meet the second criterion because the above-ground structures would result in "over-concentration" of the structures; (2) the facility did not meet the third criterion, because the facility is "out-of-character for the neighborhood"; and (3) the facility did not meet the fourth criterion because the facility would "draw attention in a negative aesthetic manner along the street."

The district court found that the City's findings as to the second criterion of the Ordinance were not supported by substantial evidence, but that the findings as to the third and fourth aesthetic criteria were supported by substantial evidence. The City does not challenge the district court's ruling as to the second criterion.

The district court ordered the actions for the Figueroa Street facility and the Descanso Drive facility consolidated. Ruling on cross-motions for summary judgment, the district court ruled against Sprint on two of its critical claims. The parties thereafter consented to dismissal of Sprint's remaining claims, and the district court entered summary judgment for the City.

## III

### A

The interpretation of the statutory provisions of the Telecom Act and the Utilities Code presents questions of law which receive *de novo* review. *Carson Harbor Vill., Ltd. v. Unocal Corp.*, 270 F.3d 863, 870 (9th Cir. 2001) (en banc). However, if this Court reviews the evidence relied upon by the City in denying the permits, the City must satisfy the substantial evidence standard. *See* 47 U.S.C. § 332(c)(7)(B)(iii). We have described the substantial evidence standard as "deferential." *See MetroPCS, Inc. v. City & County of San Francisco*, 400 F.3d 715, 725 (9th Cir. 2005); *see also id.* at 723 (holding that "substantial evidence" implies "the traditional standard used for judicial review of agency decisions") (internal quotation omitted).

### B

#### 1

[1] The Telecom Act requires that the City's permit denials be supported by substantial evidence. Specifically, 47 U.S.C.

§ 332(c)(7)(B)(iii) states that "[a]ny decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record."

**[2]** The interpretation of "substantial evidence" in the context of the Telecom Act was the focus of extended analysis in *MetroPCS*, which held that "the substantial evidence inquiry does not require incorporation of the substantive federal standards imposed by the [Telecom Act]." 400 F.3d at 723. Rather, courts should consider whether the denial is based on "substantial evidence in the context of applicable *state and local law*." *Id.* at 724. Consequently, the Telecom Act " 'does not affect or encroach upon the *substantive* standards to be applied under established principles of state and local law.' " *Id.* (quoting *Cellular Tel. Co. v. Town of Oyster Bay*, 166 F.3d 490, 494 (2d Cir. 1999); *see also id.* (concluding that the substantial evidence standard "does not create a substantive federal limitation upon local land use regulatory power")) (internal quotation omitted). *MetroPCS* accords with the decisions of other circuits in this respect. *See id.* at 723 (noting that "there appears to be universal agreement among the circuits as to the substantive content of [the substantial evidence] requirement"); *see*, *e.g.*, *Preferred Sites, LLC v. Troup County*, 296 F.3d 1210, 1219 (11th Cir. 2002); *Oyster Bay*, 166 F.3d at 494.

The substantial evidence standard is "essentially 'deferential,' " and courts may not " 'engage in [their] own fact-finding nor supplant [a city's] reasonable determinations.' " *MetroPCS*, 400 F.3d at 725 (quoting *Oyster Bay*, 166 F.3d at 494) (first alteration in original). Substantial evidence implies "less than a preponderance, but more than a scintilla of evidence." *MetroPCS*, 400 F.3d at 725 (internal quotation omitted).

**[3]** Thus, to be valid, the grounds for denial must receive at least some weight under state law. If not, the denial is

deemed "invalid even before the application of the [Telecom Act's] federal standards." *MetroPCS*, 400 F.3d at 724.

2

The relevant state law includes Utilities Code § 7901, which states:

> Telegraph or telephone corporations may construct lines of telegraph or telephone lines along and upon any public road or highway, along or across any of the waters or lands within this State, and may erect poles, posts, piers, or abutments for supporting the insulators, wires, and other necessary fixtures of their lines, in such manner and at such points as not to incommode the public use of the road or highway or interrupt the navigation of the waters.

Cal. Pub. Util. Code § 7901 (2005).

The California Supreme Court described the effect of California Civil Code ("Civil Code") § 536, the predecessor statute to § 7901, on local regulations: "[T]he right and obligation to construct and maintain telephone lines has become a matter of state concern. For this reason, the city cannot today exclude telephone lines from the streets upon the theory that 'it is a municipal affair.' " *Pac. Tel. & Tel. Co. v. City & County of San Francisco*, 336 P.3d 514, 519 (1959). Similarly, the authority to proscribe regulations under Civil Code § 536 on the basis of "incommode" was narrow. *See Pacific Tel. & Tel. Co. v. City & County of San Francisco*, 17 Cal. Rptr. 687, 694 (Cal. Ct. App. 1961) (interpreting "incommode" to mean the prevention of "unreasonable obstruction of the public use").

In 1991, the California state legislature adopted § 7901.1(a), which reads in relevant part: It is the intent of the Legislature, consistent with Section 7901, that municipalities shall have the right to exercise reasonable control as to the

time, place, and manner in which roads, highways, and waterways are accessed. Cal. Pub. Util. Code § 7901.1(a) (2005).

3

Article XI, § 7 of the California Constitution states that a "county or city may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws." A local law that "duplicates, contradicts, or enters an area fully occupied by general law, either expressly or by legislative implication" will be preempted by the state law. *Fireman's Fund Ins. Co. v. City of Lodi*, 302 F.3d 928, 941 (9th Cir. 2002) (internal quotation omitted); *Tily B., Inc. v. City of Newport Beach*, 81 Cal. Rptr. 2d 6, 18 (Cal. Ct. App. 1998) (In California, "[s]tate law preempts local legislation if an ordinance duplicates, contradicts, or enters an area fully occupied by the general laws, either expressly or by implication."). Therefore, if Utilities Code §§ 7901 and 7901.1 apply, they may preempt the local ordinance.

**[4]** Section 7901 gives telephone companies broad authority to construct telephone lines and other fixtures "in such manner and at such points as not to incommode the public use of the road or highway or interrupt the navigation of the waters." By the plain text of the statute, the only substantive restriction on telephone companies is that they may not "incommode the public use" of roads. It is possible that extremely severe aesthetic objections could conceivably incommode the use of the roads. *See* 7 *The Oxford English Dictionary* 806 (Oxford University Press, 2d ed., 1989) (defining "incommode" as "[t]o subject to inconvenience or discomfort; to trouble, annoy, molest, embarrass, inconvenience"). An extraordinarily unattractive wireless antenna might, for example, cause such visual blight that motorists are uncomfortable using the roads. Counsel for the City posited, during oral argument, that an unattractive wireless structure could cause "discomfort."

**[5]** However, the most natural reading of § 7901 grants broad authority to telephone companies to install necessary wires and fixtures, so long as they do not interfere with public use of the roads. The text focuses on the *function* of the road —its "use," not its enjoyment. Based solely on § 7901, it is unlikely that local authorities could deny permits based on aesthetics without an independent justification rooted in interference with the function of the road.

**[6]** Section 7901, however, has been modified by § 7901.1. Two provisions determine the extent of local regulatory authority under § 7901.1: first, the breadth of "time, place, and manner," and second, the meaning of "are accessed."

The phrase "time, place, and manner" seems to expand local regulatory authority beyond the "incommode" standard in the earlier § 7901. Despite some legislative history, of which the district court took judicial notice, that portrays § 7901.1 as merely "clarify[ing]" the law, the plain text indicates that this provision expands municipal authority.[1] April 24, 1995, Statement for SB 621 to Cal. Sen. Energy, Utilities and Communications Comm. (S. 1994-95 Reg. Sess.). Specifically, "incommode" refers to the disruption of the reasonable use of the road. While the authority to restrict building based on "time, place, and manner" gives cities more authority to determine what constitutes a reasonable use of the road, this language does not seem to enhance greatly the City's regulatory latitude—certainly not to the extent necessary to engage in aesthetic regulation.

**[7]** A regulation of appearance could conceivably be considered a regulation of the "manner" in which telephone companies use public roads. However, this seems to stretch the

---

[1]Some legislative history accords with this reading as well. *See*, *e.g.*, Analysis of SB 621, Cal. Sen. Rules Comm., Office of Senate Floor Analyses (S. 1994-95 Reg. Sess.) ("This bill is intended to *bolster* the cities' abilities with regard to construction management." (emphasis added)).

word "manner," which, coupled with "time" and "place," cannot be read so broadly. More importantly, the City's reading is illogical when coupled with the "are accessed" language that follows. Section 7901.1 only gives cities the authority to regulate the manner is which roads "are accessed," not the authority to regulate the manner in which telephone companies affect the road's appearance. The better reading of "time, place, and manner" does not expand the City's authority far enough to include aesthetic regulation.

**[8]** Further, the "are accessed" language restricts local authority: cities may only regulate the way in which roads "are accessed," not the way they appear. As with § 7901, the regulatory power is functional, and does not extend to aesthetics. In sum, under Utilities Code §§ 7901 and 7901.1, local regulators retain no authority to deny permits based on aesthetics.

The City, however, cites cases holding that aesthetics can properly be considered substantial evidence. *See, e.g.*, *Omnipoint Corp. v. Zoning Hearing Bd. of Pine Grove Twp.*, 181 F.3d 403, 409 (3d Cir. 1999) (noting that aesthetic considerations, as opposed to alleged health effects, are proper evidence under 47 U.S.C. § 332(c)(7)(B)(iii)); *Aegerter v. City of Delafield*, 174 F.3d 886, 891 (7th Cir. 1999) ("Nothing in the Telecommunications Act forbids local authorities from applying general and nondiscriminatory standards derived from their zoning codes, and we note that aesthetic harmony is a prominent goal underlying almost every such code."). However, whether aesthetic evidence *can* be a used to support a permit denial in the abstract is not at issue—the issue is simply whether a city can consider such evidence consistent with California law. Under Utilities Code §§ 7901 and 7901.1, they cannot.

4

Section 332(c)(7)(A) of the Telecom Act provides that "[e]xcept as provided in this paragraph, nothing in this Chap-

ter shall limit or affect the authority of a State or local govern-ment or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wire-less service facilities." 47 U.S.C. § 332(c)(7)(A).

**[9]** If the local ordinance is valid under the Telecom Act, despite being invalid under state law, *see supra* III.B.3, then the Telecom Act effectively provides a measure of sovereign authority to cities, which their own state constitutions and statutes deny them. The language of subsection (c)(7)(A), however, does not imply that local law should be valid to the exclusion of state law, but merely that local law itself may not be ignored. Thus, if the local law itself is invalid—for exam-ple, because it conflicts with state law—then subsection (c)(7)(A) will not save it. If the Telecom Act intended to grant such authority to local laws—even those that are preempted by state laws—it might have preserved the authority of "State *and* local government[s]," rather than the disjunctive.

Further, the City argues that the plain language of the statute—preserving the authority of "State *or* local government"—mandates City autonomy. Under this reading of the statutory text, the Telecom Act does not limit state rules *or* local rules. Thus, since there is a local rule, whether or not valid, the Telecom Act must recognize it, goes the argument.

We are not persuaded. The disjunctive language implies that state *or* local authority is preserved, not that both are nec-essarily preserved regardless of other constraints. Further, even if we followed the City's argument and held that the lan-guage of subsection (c)(7)(A) preserves local authority, there is no local authority here in the first place—state law has already preempted local authority. The "state or local govern-ment" language, in context, affirms preexisting authority—"nothing in this chapter shall *limit or affect* the authority"—it is not a positive grant of authority where none rightly exists. The City's reading ignores the plain statutory mandate that "nothing . . . shall . . . affect the authority," since the Telecom

Act would affect local authority by expanding local regulatory power.

Given that the plain language of the statute is clear, it is not necessary to address public policy arguments. In any event, public policy also supports this interpretation. The City's proffered interpretation uses the Telecom Act to grant broad regulatory authority to cities or municipalities that would otherwise be constrained by state law. In other words, the City's reading of the "State or local government" language would set cities free to regulate to the extent of their traditional police power. This result would be antithetical to the purpose of the Telecom Act, whose goal is "to promote competition and higher quality in American telecommunications services and to 'encourage the rapid deployment of new telecommunications technologies.' " *City of Rancho Palos Verdes v. Abrams*, 125 S. Ct. 1453, 1455 (2005) (quoting the Telecom Act).

## C

**[10]** The Telecom Act requires permit denials be supported by substantial evidence. 47 U.S.C. § 332(c)(7)(B)(iii) (2005). Because the City overstepped its regulatory authority under state law, its wireless ordinance is invalid, and no evidence supports the City's permit denial. The district court's conclusion that substantial evidence supported the City's permit denials must be reversed.

## IV

In light of our disposition of this case, we need not reach Sprint's additional claims that the city discriminated against it in violation of 47 U.S.C. § 332(c)(7)(B)(i)(I).

REVERSED.